**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE** | ) | **Mag. No.** |
| **SEARCH OF** | ) | |
| | ) | |
| **2233 MINNESOTA AVE., SE** | ) | |
| **WASHINGTON, D.C. 20022** | ) | |

<u>**AFFIDAVIT IN OF SUPPORT OF APPLICATION FOR SEARCH WARRANT**</u>

I, Phillip Robinson, Detective with the Metropolitan Police Department, being duly

sworn hereby states as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      Your affiant has been a sworn member of the Metropolitan Police Department

(MPD) Washington, D.C., for twenty six years and is currently assigned to the Financial

Investigation Unit of the Narcotic Special Investigation Division.  Presently, I am assigned to the

Washington/Baltimore High-Intensity Drug Trafficking Area (HIDTA) money laundering task-

force. I am also deputized as a federal agent by the Department of Homeland Security

Investigations (HSI). Twenty four years of my tenure as a police officer have been in the

investigative field. While assigned as a detective, I have investigated more than one hundred

narcotics violators. I have also executed or assisted in the execution of more than two hundred

warrants for search and seizure. I have received several weeks of specialized training concerning

numerous aspects of financial investigations and money laundering.  I have also received training

concerning the various forms of narcotic trafficking to include, but not limited to, Narcotics and

Dangerous Drugs hosted by officials from the Drug Enforcement Administration (DEA).

2.      Through my training and experience, I am familiar with the actions, habits, traits,

methods, and terminology utilized by money launders, drug traffickers and abusers of these

controlled substances. I have personally participated in this investigation and am familiar with

the facts, as outlined below. The information contained herein is based on my personal

knowledge, information provided to me by other law enforcement personnel, and information

obtained from public records, cooperative witnesses, and other sources, as indicated herein.  Any

confidential source referred to herein has had its reliability established throughout the course of

this investigation by way of recognized investigative methods, including corroboration.

       3.     Based on my training, experience and participation in narcotic and drug related

investigations, I know that:

       a.     It is common for narcotics traffickers to conceal narcotics, other

contraband, proceeds of drug sales and records of drug transactions in secure locations within

their residences, their businesses and/or other locations over which they maintain dominion and

control for ready access and to conceal these items from law enforcement authorities.

       b.     In order to accomplish this concealment, narcotic traffickers frequently

have "stash" places in which the traffickers maintain evidence pertaining to their narcotic

business as well as records which reflect the manner in which they conceal ill-gotten proceeds,

such as currency, financial instruments, precious metals and gemstones, jewelry, books, records,

invoices and receipts, bank records, photographs, and safe deposit box keys, as well as maintain

money counting machines and safes.

       c.     Narcotics traffickers often utilize electronic equipment such as computers,

cellular telephones, personal tablets, laptop computers and other personal electronic devices to

generate, transfer, count, record and/or store the information described above.

       d.     Narcotics traffickers commonly maintain addresses or telephone numbers

in books or papers which reflect names, addresses and/or telephone numbers of their associates

in the trafficking organization, and frequently possess and maintain photographs of these associates.

      e.    Narcotics traffickers commonly maintain documents, letters and records relating to illegal activity for long periods of time.  This documentary evidence is usually secreted in their business, residence, or the residences of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house. This documentary evidence includes but is not limited to telephone numbers, telephone books, address books, credit card and hotel receipts and other travel indicia, plane and bus tickets and receipts, car rental receipts, passports, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.  Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises.

      f.    With respect to the trafficking of illegal synthetic drugs, including synthetic cannabinoids such as XLR-11, in recent years in the Washington, D.C. metropolitan area, illegal synthetic drugs are often transported into the area from elsewhere in the country. Illegal synthetic compounds in chemical form are often shipped to the United States from foreign chemical suppliers, and then either mixed with plant material or dissolved in liquid and then applied to plant material.  In Washington, D.C., law enforcement has seen that many of the synthetic drugs then make their way into the local community in colorfully labeled packets containing different "brand" names and claims such as "not for human consumption."  In recent years, many of these packages have then been distributed for resale in gas stations and convenience stores.  Individual packets can then be bought at such places for personal use by an

end-user, or bought for purposes of further redistribution by breaking them into smaller units such as "joints" for further resale.

   g. With respect to the trafficking of illegal synthetic drugs, including synthetic cannabinoids such as XLR-11, in recent years in the Washington, D.C. metropolitan area, these synthetic drugs have often been sold covertly at stores such as convenience stores and gas stations.  Store owners and employees have often made arrangements to have the synthetic drugs available in a concealed or partially-concealed area or container near the counter for those who ask for them, so that employees and/or owners can sell them to individuals who come to the counter and ask for such synthetic drugs directly.  Your affiant understands that when confronted by law enforcement after undercover purchases or inspections, sometimes some owners and employees who have sold such illegal synthetic products claim (falsely in law enforcement's view) that they did not know such synthetic drugs were illegal – even though they sold such products in a covert manner and very differently from other legal store products.  Your affiant understands that legitimate stores often keep books and records of their legal inventory, and based on his training and experience, your affiant anticipates that stores would keep any records of illegal synthetic products separate from other books and records, as part of an effort to conceal their sale.  Consequently, based on my experience as a financial investigator, it is valuable for investigative purposes to review and compare all records – whether of legal or illegal inventory-- and books of store inventory and receipts, sales tax records, and other financial records, because omissions of data related to synthetic drugs that are sold covertly can constitute consciousness of guilt evidence.

   h. With respect to the trafficking of illegal synthetic drugs, including

synthetic cannabinoids such as XLR-11, local traffickers often use cell phones, the internet, email, and computers in order to facilitate the delivery of synthetic drugs from elsewhere in the country or even from overseas.  Indeed, some illegal synthetic drugs can reportedly be purchased over the internet.  As a consequence, the premises of, and the electronic storage media and digital devices in the hands of, illegal synthetic drug traffickers and businesses that sell such products often contain records related to the shipment of and payment for illegal synthetic drugs, the identity of individuals involved in such trafficking, and the methods used to facilitate such trafficking.

4.     The facts and information contained in this affidavit are based on your affiant's personal knowledge, and information obtained from federal and/or state law enforcement officers. All observations referenced in this affidavit that were not personally made by me were related to me by the persons who made such observations through reports or conversations. This affidavit only contains such information as is necessary to show probable cause that the premises known as Minnesota Grocery, located at 2233 Minnesota Avenue, S.E., Washington D.C.  20020 (hereinafter the **Premises**), as further described in Attachment A, contains the items described in Attachment B, both attached and incorporated as part of this affidavit, all of which constitute evidence, fruits, and instrumentalities of violations of United States federal law.

5.     On the basis of this familiarity, and on the basis of the other information that the affiant has reviewed and determined to be reliable, it is alleged that there is probable cause to believe that persons known and unknown, have committed federal felony offenses, to wit, the possession of controlled substances with intent to distribute, and attempts and conspiracies to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  It is further

alleged that the facts contained herein establish probable cause for the issuance of a search and

seizure warrant for the **Premises** to obtain further evidence of the commission of these offenses.

6.      This affidavit is based on events related to the controlled delivery of an

approximately 256-pound shipment of illegal, Schedule I, synthetic cannabinoid drugs (here

XLR-11) to a commercial storage facility in Northwest Washington, D.C, as further described

below.  The two individuals who received delivery of that shipment on September 1, 2015, were

arrested that same day, and were subsequently indicted on September 3, 2015, for Unlawful

Possession with Intent to Distribute XLR-11 in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(C), in the case of *United States v. Sirja Issa and Yenework Tefera Abera*, 15-CR-

00109(RMC).  The matter continues to remain under investigation by law enforcement.

Subsequent investigation has revealed that defendant SIRJA ISSA is involved in a managerial

and financial capacity with the **Premises**, and that the **Premises** constitute a place of business for

defendant ISSA.  Based on your affiant's knowledge and experience that drug traffickers

frequently keep records and other documents related to their activities at their places of business,

your affiant submits that there is sufficient probable cause for a warrant authorizing the search

for and seizure of relevant documents, as described in Attachment B, at the **Premises.**

7.      Your affiant would also note that, as discussed further below, there is additional

information that would suggest defendant ISSA also utilized the **Premises** in his drug trafficking

endeavors.  As further discussed below, subsequent investigation has revealed the existence of

previous suspect shipments believed likely to have been illegal synthetic drugs not only to the

same storage facility where the controlled delivery was recently made, but also to the **Premises**.

Your affiant therefore submits that the evidence of these additional shipments to the **Premises**

6

provides additional support for probable cause.

## **INVESTIGATION**

Seized Shipment of Synthetics

8.      In support of this application and the basis for probable cause, your affiant

deposes and states that on or about August 27, 2015, members of the Maryland State Police and

Metropolitan Area Drug Task Force were conducting proactive drug trafficking interdiction

efforts at a shipping company in Howard County, Maryland.  They observed a large wooden

pallet containing numerous boxes that were wrapped in clear plastic wrap on the shipping floor

(hereinafter the "shipment").  The shipment was designated for delivery at a commercial storage

facility in Northwest, Washington, D.C.  A police dog alerted to the potential presence of illicit

substances while conducting a scan of the shipment, and a member of the task force obtained a

search warrant to examine the shipment.  The search warrant was executed, and officers

discovered that the shipment contained thirteen (13) large brown cardboard boxes and one (1)

large white cardboard box, each containing large plastic bags, which in turn contained numerous

packets labeled "Bizarro" in assorted sizes.  In your affiant's experience, "Bizarro" is a

packaging name that has been used for illegal synthetic cannabinoid products seized within the

District of Columbia on previous occasions by the Metropolitan Police Department.  Your affiant

would also note that the shipment was falsely described on the delivery receipt as containing 600

pounds of "PLT glass pipes," which is consistent with the steps drug traffickers take in order to

conceal their products.

9.      On August 28, 2015, your affiant randomly retrieved one 10 gram packet of

"Bizarro" from a box contained in the shipment (hereinafter "shipment sample").  This shipment

sample contained a green plant material, and was taken to a laboratory of the Bureau of Customs

and Border Protection for testing.  Later that day, your affiant was informed by the lab that

preliminary screening of the shipment sample was complete, indicating that the shipment sample

contained a detectable amount of XLR-11, a Schedule I controlled substance under federal law.

10.     On September 1, 2015, your affiant along with other law enforcement officers

conducted a controlled delivery of the shipment to the designated storage facility in Northwest,

Washington, D.C.  During this operation, defendant YENEWORK TEFERA ABERA drove a

red and gray minivan into the parking lot of the storage facility complex.  Defendant SIRAJ

ISSA was in the passenger seat.  An undercover officer approached the passenger side of the van.

After a brief conversation, the undercover officer left the van and then returned, and defendant

ISSA signed the delivery receipt for the shipment, using a false name and falsely telling an

undercover officer that his last name was "Miller."  After signing for the shipment, defendant

ISSA went back into the minivan (being driven by defendant ABERA) and the two defendants

then briefly left the lot of the storage facility.  They drove a short distance, then did a U-turn and

returned to the lot.  Law enforcement believes this might have been part of an apparent effort to

avoid detection, such as to see if they were being followed or observed, or to see where the

undercover went.  Defendant ISSA then exited the vehicle, entered the office area of the storage

complex, and returned outside while pulling two hand carts.  After removal of the shrink-wrap,

defendants ABERA and ISSA then began loading the handcarts with the 14 boxes of the

shipment.

9.     At that point, both defendants then took the two hand carts into a different

building of the complex than the building designated on the shipping label (the shipping label

designated unit #5071, which is contained in a different building of the complex), which your affiant notes is consistent with the efforts of drug traffickers to conceal their activities from monitoring by law enforcement. Law enforcement lost sight of the defendants for a brief time. Within minutes, law enforcement observed defendants ISSA and ABERA within the building, placing boxes from the two handcarts into storage unit #2027, which is on the second floor of the building. Other than law enforcement, the two defendants were the only individuals observed on the second floor. An undercover officer then briefly left the area, and while within earshot heard the sound of the unit's gate closing. Within moments, law enforcement stopped both defendants near an elevator on the second floor while they were in possession of the two empty hand carts.

10.     During a search incident to arrest, a key-ring was recovered from defendant ISSA's person. Law enforcement determined that one of the keys on the ring fit the lock to Unit #2027 by using it to unlock and then lock the lock without opening the storage door. The unit was then made secure, and a search warrant was obtained.

11.     The search warrant for Unit #2027 was executed. The search revealed all 14 boxes of the shipment were contained within Unit #2027, along with a "consignee copy" of the shipping label documents that had accompanied the shipment. Furthermore, law enforcement observed that one of the shipment boxes had been partially opened at the top, revealing packets of "Bizarro" contained within. Given that these boxes had been fully taped and closed prior to the controlled delivery, your affiant believes that the defendants opened the box and observed the contents of the shipment before locking Unit #2027.

12.     In addition to the 14 boxes of the shipment, the search of Unit #2027 also revealed three empty boxes within the unit. Two of the boxes appeared to be consistent with the

boxes of the shipment, inasmuch as the boxes appeared to be of the same kind of grade of cardboard and were similarly taped with the same colored packing tape.  In addition, on the floor of Unit #2027, law enforcement discovered a printed packing label with handwriting.  The handwriting indicated, among other things, a date of "3/20/2013," the "night" shift, the word "strawberry," and a size of "3.5g," and a quantity of "100."  Law enforcement believes that this label refers to a previous shipment of suspected Bizarro packets of a strawberry flavor in 3.5 gram sizes, and that in combination with the empty boxes, this is indicia of Unit #2027 having been used for the storage of illegal synthetic cannabinoid products on at least one previous occasion.   Your affiant would note that the seized shipment contained "Bizarro" packets that were labeled "Blueberry," and that subsequent investigation revealed that defendant ISSA has been renting storage Unit #2027 since April 2013.

13.     After arrest and upon waiving his Miranda rights, defendant ABERA spoke to your affiant.  Among other things, defendant ABERA said that on several previous occasions within the past two to five months, he had come to the storage facility complex and received black trash bags from defendant ISSA, which defendant ABERA would then deliver to various persons located at various locations within Washington, D.C., in return for monetary compensation from defendant ISSA.  Defendant ABERA indicated that he had received up to $200 for making a single delivery.  Defendant ABERA claimed that he thought the black bags contained hair product or other dollar store items.  Additionally, defendant ABERRA indicated that defendant ISSA had told him the bags contained dollar store items.

14.     The aforementioned shipment was subsequently inventoried by law enforcement. That inventory determined that the shipment consisted of approximately 19,247 individual

"Bizarro" packets.  Each packet was labeled with a reported weight, and there were two "sizes" present:  3.5 grams and 10 grams.  Based on the packaging labels, the total net weight of the shipment (absent the boxes, pallet, and other packaging) was approximately 116.498 kilograms, or approximately 256 pounds.   Your affiant knows that Members of the Metropolitan Police Department have previously seized packets of "Bizarro" and other suspected synthetic cannabinoid products in the District of Columbia, and consistent with the packaging of previously-seized (and similarly-sized) illegal synthetic cannabinoid products, the products in this shipment likewise contained stickers on the back that indicated they were for creating "aroma only" and were not for human consumption, and also providing a list of ingredients that were supposedly not contained within the packet.  Law enforcement understands that the manufacturers of these products often use the same or similar labeling in an effort to avoid regulation by the Food and Drug Administration, to avoid detection, and to falsely claim lack of knowledge of the illegal nature of their products

Indications of Previous Shipments of Suspected Synthetics to Storage Facility

15.   In addition to the empty boxes and packing label with handwriting that was found when executing the search warrant on Unit #2027 as described above, along with defendant ISSA's rental of Storage Unit #2027 since April 2013, your affiant would note that subsequent investigation has also revealed indications of previous shipments to the storage complex that are consistent with the seized shipment.  The shipping documents for each of these shipments reveal similar descriptions of contents ("PLT" or "SKD" glass pipes) in shipments of hundreds of pounds; the sender being a "Huka World" in Gardena, CA (with alternative addresses); the consignee address being the same unit at the storage facility; and the designated "CFA" contact

being "Mike" and the "Ques" contact being "Eddie" (albeit with alternative phone numbers).

Your affiant would also note that in making the controlled delivery of the seized shipment, on

September 1, 2015, an undercover established phone contact with both the "Mike" and the

"Eddie" that were designated on the shipping paperwork; defendant ISSA asserted that he was

"Mike" during the delivery, and via phone contact "Eddie" indicated that he was the shipper.

Your affiant believes that "Mike's" appearance on the previous shipping labels means that

defendant ISSA was also associated with these previous shipments.  This information is

described below as to each of the aforementioned shipments:

| Shipment # and Description | Ship Date, Sender and Sender's Address | CFA Contact and Questions Contact | Consignee Address |
|---|---|---|---|
| **367576881 "PLT Glass Pipes" 600 pounds [the seized shipment]** | **8/19/15 Huka World 1565 W 132nd Street Gardena, CA  90249** | **CFA: Mike (xxx-xxx-x192) Ques: Eddie (xxx-xxx-x182)** | **[storage facility in NW D.C.] Unit #5071 [stored in #2027]** |
| 333481380 "SKD Glass Pipes" 500 pounds | 5/14/15 Huka World 20145 W Rosencrans Ave Gardena, CA  90249 | CFA: Mike (xxx-xxx-x360) Ques: Eddie (xxx-xxx-x213) | [storage facility in NW D.C.] Unit 5071 |
| 350440749 "PLT Glass Pipes" 400 pounds | 3/23/15 Huka World 17510 S Figuerora St Gardena, CA  90248 | CFA: (xxx-xxx-x360) Ques: Eddie: (xxx-xxx-x885) | [storage facility in NW D.C.] Unit 5071 |
| 350541660 "PLT Glass Pipes" 250 pounds | 2/17/15 Huka World 2045 W Rosencrans Ave c/o SAF Keep Self Storage Gardena, CA  90249 | CFA: Mike (xxx-xxx-x360) | [storage facility in NW D.C.] Unit 5071 |
| 350650255 "SKD Glass Pipes" 300 pounds | 1/20/15 Huka World 17510 S Figuerora St Gardena, CA  90248 | CFA: Mike (xxx-xxx-x360) Ques: Eddie (xxx-xxx-x885) | [storage facility in NW D.C.] Unit 5071 |
| 350650719 "SKD Glass Pipes" | 1/09/15 Huka World | CFA: Mike (xxx-xxx-x360) | [storage facility in NW D.C.] |

| 200 pounds | 17510 S Figuerora St Gardena, CA  90248 | Ques: Eddie (xxx-xxx-x885) | Unit 5071 |

Based on all of these circumstances, your affiant submits there is probable cause to believe that defendant ISSA has been using Storage Unit #2027 to stash illegal synthetic products for some time, and has been receiving them in a manner consistent with the seized shipment.

The Retail Store

16.     Search incident to the arrest of defendant ISSA resulted in the seizure of a wallet concealed on his person.  The contents of his wallet included:  1) a Visa - Bank of America Business Debit Card with the name MINNESOTA GROCERY STORE – SIRAJ ABRAR ISSA depicted on the front; 2) a Costco Wholesale members card with the name SIRAJ A ISSA – MINNESOTA GROCERY INC depicted on the back; and 3) a Bank of America blank check #1012 account with "MINNESOTA GROCERY STORE, 2233 Minnesota Ave SE Washington DC 20020-5323" depicted on the front.  Your affiant would note that the business debit card, Costco card, and blank check are consistent with defendant ISSA's being involved with the **Premises** in a capacity that allows him to expend funds on behalf of the corporation, and the Costco member card (for an entity that provides "wholesale" quantities of consumer products that can also be found in convenience stores) is also consistent with defendant ISSA's being involved with the acquisition of legal inventory for the **Premises**.

17.     According to District of Columbia's Department of Regulatory Affairs ("DCRA"), MINNESOTA GROCERY INC is an active entity which is located at 2233 Minnesota Ave SE, Washington, DC 20022.  MINNESOTA GROCERY INC was incorporated on or about August 17, 2014.  A check of the DCRA Corporation Division data base revealed

that defendant ISSA is the "Governor" for MINNESOTA GROCERY INC.  According to

District of Columbia code § 29-101.02, a "Governor" is defined as the Director of a business

corporation.   A further check of the DCRA Corporation Division data base revealed that

defendant ISSA is also the "Incorporator" for MINNESOTA GROCERY INC. According to

District of Columbia code § 29-302.01, "one or more persons may act as the incorporator or

incorporators of a corporation by delivering articles of incorporation to the Mayor for filing."

18.     Given the contents of defendant ISSA's wallet and his association with the

**Premises**, as well as the DCRA records, your affiant submits there is probable cause to believe

that defendant ISSA is associated with the **Premises** in a managerial capacity that involves the

ability to control financial transactions as well as payments for the business at that location and

the purchase of inventory.

19.     Further investigation has revealed indications of previous shipments to the

**Premises** that are consistent with the seized shipment.  The shipping documents for each of these

shipments reveal similar descriptions of contents ("PLT" or "SKD" glass pipes) in shipments of

hundreds of pounds; the sender being a "Huka World" in Gardena, CA (with alternative

addresses); the consignee address being the **Premises**; and the designated "CFA" contact being

"Mike" or "Bill" and the "Ques" contact being "Eddie" (albeit with alternative phone numbers).

This information is described below as to each of the aforementioned shipments:

| Shipment # and Description | Ship Date, Sender and Sender's Address | CFA Contact and Questions Contact | Consignee Address |
|---|---|---|---|
| **367576881 "PLT Glass Pipes" 600 pounds [the seized shipment]** | **8/19/15 Huka World 1565 W 132nd Street Gardena, CA  90249** | **CFA: Mike (xxx-xxx-x192) Ques: Eddie (xxx-xxx-x182)** | **[storage facility in NW D.C.] Unit #5071 [stored in #2027]** |
| 333481109 "PLT Glass Pipes" 400 pounds | 5/08/15 Huka World 20145 W Rosencrans Ave Gardena, CA  90249 | Attn: Bill (xxx-xxx-x360) Ques:  Eddie (xxx-xxx-x213) | Minnesota Market 2233 Minnesota Ave SE Washington, DC  20020 |
| 291908044 "PLT Glass Pipes" 200 pounds | 12/01/14 Huka World 17510 S Figueroa St Gardena, CA  90248 | Attn: Bill (xxx-xxx-x360) Ques: Eddie (xxx-xxx-x885) | Minnesota Market 2233 Minnesota Ave SE Washington, DC  20020 |
| 333240885 "PLT Glass Pipes" 300 pounds | 10/31/14 Huka World 17510 S Figueroa St Gardena, CA  90248 | Attn: Bill (xxx-xxx-x360) | Minnesota Market 2233 Minnesota Ave SE Washington, DC  20020 |
| 333239598 "SKD Glass Pipes" 300 pounds | 10/08/14 Huka World 17510 S Figuerora St Gardena, CA  90248 | Attn: Bill (xxx-xxx-x360) Ques: Eddie (xxx-xxx-x885) | Minnesota Market 2233 Minnesota Ave SE Washington, DC  20020 |

As discussed above, your affiant believes that the name "Mike" on all the shipping labels for the storage facility means that defendant ISSA was also associated with those previous shipments given that defendant ISSA claimed to be "Mike" during the controlled delivery.  Moreover, for the shipments to "Minnesota Market," your affiant would note that the phone number listed for "Bill" as the CFA contact for the shipments to the **Premises** is the same phone number used for "Mike" on five of the six shipments to the storage facility.  In addition, the recipient signature for the May 8, 2015, delivery to "Minnesota Market" contains the printed name of "Sirja A. Issa," which is believed to be defendant ISSA (the recipient paperwork for the other shipments to "Minnesota Market" purport to have different recipients).  Based on all of these circumstances,

your affiant submits there is probable cause to believe that defendant ISSA was associated with the shipments of suspected illegal synthetic drugs to the **Premises.**

20.     Your affiant would further note that in the past few years, the Metropolitan Police Department has very frequently noted the covert availability (as described above) of illegal synthetic products at a variety of convenience stores throughout The District of Columbia. Given defendant ISSA's association with the seized shipment, the suspect shipments at the storage facility and the **Premises**, defendant ISSA's apparent managerial and inventory role at the **Premises**, and the nature of the **Premises** as a convenience/grocery store, your affiant submits there is probable cause to believe that the **Premises** has also been used in defendant ISSA's drug trafficking activities.  While your affiant has learned that a consensual search of the Premises on June 17, 2015, by the Metropolitan Police Department (in response to citizen complaints about the sale of illegal synthetic products from the **Premises**) revealed no illegal synthetic drugs at that time, the volume of the suspect shipments to this location suggests that simply no product was to be found at the **Premises** at that specific time (or perhaps that it was hidden or otherwise undiscovered).

## TECHNICAL TERMS

21.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes

any data storage facility or communications facility directly related to or operating in conjunction with such device."  <u>See</u> 18 U.S.C. § 1030(e)(1).

      b.    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      c.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      d.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer

software is stored in electronic, magnetic, or other digital form.  It commonly includes programs
to run operating systems, applications, and utilities.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

22.      As described above and in Attachment B, this application seeks permission to
search for records that might be found on the **Premises**, in whatever form they are found.  One
form in which the records might be found is data stored on a computer's hard drive or on other
electronic storage media or digital devices.  As used herein, the terms "electronic storage media"
and "digital devices" include any electronic system or device capable of storing or processing
data in digital form, including central processing units; desktop computers, laptop computers,
notebooks, and tablet computers; personal digital assistants; wireless communication devices,
such as telephone paging devices, beepers, mobile telephones, and smart phones; digital
cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related communications devices, such as
modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks,
USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data
(excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for
would authorize the seizure of electronic storage media and digital devices or, potentially, the
copying of electronically stored information, all under Rule 41(e)(2)(B).

23.      *Probable Cause.*  Based on my knowledge, training, and experience, as well as
information related to me by agents and others involved in this investigation and others and in
the forensic examination of digital devices, I respectfully submit that if electronic storage media
or digital devices are found on the **Premises**, there is probable cause to believe that the records

18

and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a.    Individuals who engage in criminal activity, including possession of illegal synthetic drugs and other controlled substances with intent to distribute, and attempts and conspiracies to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, not only use computers to access websites used for illegal activity and to communicate with co-conspirators online, but also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity. Drug traffickers store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifier for instant messaging and social medial accounts; financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; records of travel in connection with their activities; and records of illegal transactions using financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; and (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.  In addition, convenience stores (such as the entity at the **Premises**) often utilize computers to facilitate legal activities that take place at their locations, as well as to store financial and inventory and other business records related to legitimate inventory – and as discussed above, such data itself can constitute evidence related to the sale of illegal synthetic drugs, where omissions related to illegal inventory constitute evidence of consciousness of guilt.

b.     Individuals who engage in the foregoing activities, in the event that they
change computers, will often "back up" or transfer files from their old computers' hard drives to
that of their new computers, so as not to lose data, including that described in the foregoing
paragraph, which would be valuable in facilitating their criminal activity.

c.     Computer, smart phone, and other digital device files, or remnants of such
files, can be recovered months or even years after they have been downloaded onto an electronic
storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic
storage medium can be stored for years at little or no cost.  Even when such files have been
deleted, they can be recovered months or years later using readily-available forensics tools.
When a person "deletes" a file on a digital device such as a home computer or a smart phone, the
data contained in the file does not actually disappear; rather, that data remains on the electronic
storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of
deleted files, may reside in free space or slack space – that is, in space on the electronic storage
medium that is not allocated to an active file or that is unused after a file has been allocated to a
set block of storage space – for long periods of time before they are overwritten.  In addition, a
digital device's operating system may also keep a record of deleted data in a "swap" or
"recovery" file.  Similarly, files that have been viewed via the Internet are automatically
downloaded into a temporary Internet directory or "cache."  The browser typically maintains a
fixed amount of electronic storage medium space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to
retrieve "residue" of an electronic file from an electronic storage medium depends less on when

the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

24.     *Forensic Evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this and other investigations and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the **Premises** because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.       Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

25.     *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and others and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example,

desktop computers, mobile devices, or portable storage devices – may be customized with a vast

array of software applications, each generating a particular form of information or records and

each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be

necessary to consult with specially trained personnel who have specific expertise in the types of

digital devices, operating systems, or software applications that are being searched, and to obtain

specialized hardware and software solutions to meet the needs of a particular forensic analysis.

      b.      Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise, scientific

procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic

files from electronic storage media also requires specialized tools and often substantial time.  As

a result, a controlled environment, such as a law enforcement laboratory or similar facility, is

essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.      The volume of data stored on many digital devices will typically be so

large that it will be extremely impractical to search for data during the physical search of the

premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128

gigabytes, and desktop computers capable of storing 500 or more gigabytes are now

commonplace.  Consequently, just one device might contain enormous amounts of data.

      d.      Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in the

absence of particular data on a digital device.  For example, to rebut a claim that the owner of a

digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows

someone else to control the digital device remotely is not present on the digital device.  Evidence

of the absence of particular data or software on a digital device is not segregable from the digital

device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

data or software requires specialized tools and a controlled laboratory environment, and can

require substantial time.

           e.        Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword

terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches.  Some applications for computers, smart phones, and other

digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

text format.  Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by keyword searches

because the printed document is stored by the computer as a graphic image and not as text.  In

addition, digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital device

user can conceal text in an image file that cannot be viewed when the image file is opened.

Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are

not scrupulously followed.  A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence,

contraband or instrumentalities of a crime.

       f.      Analyzing the contents of mobile devices can be very labor intensive and

also requires special technical skills, equipment, and software.  The large, and ever increasing,

number and variety of available mobile device applications generate unique forms of data, in

different formats, and user information, all of which present formidable and sometimes novel

forensic challenges to investigators that cannot be anticipated before examination of the device.

Additionally, most smart phones and other mobile devices require passwords for access.  For

example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated

encryption known as "AES-256 encryption" to secure and encrypt the operating system and

application data, which could only be bypassed with a numeric passcode.  Newer cell phones

employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most

smart phones inaccessible without highly sophisticated forensic tools and techniques, or

assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party

applications, of which there are many.  For example, one such mobile application, "Hide It Pro,"

disguises itself as an audio application, allows users to hide pictures and documents, and offers

the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the **Premises**, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the **Premises**.  The electronic storage

27

media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or

digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

4.     The entity referred to variously as MINNESOTA GROCERY, MINNESOTA MARKET, MINNESOTA GROCERY INC., and MINNESOTA GROCERY STORE  at the **Premises** ("the Company") is a functioning entity that also appears to conduct some legitimate business.  The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what electronic storage media and digital devices must be seized or copied, and what electronic storage media and digital devices need not be seized or copied. Where appropriate, law enforcement personnel executing the warrant will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business.  If, after inspecting seized computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve evidence, the government will return it.

## **CONCLUSION**

26.     Based upon these facts, your affiant concludes that probable cause exists to believe that evidence at the **Premises** at 2233 Minnesota Avenue, S.E. Washington DC, as further described in Attachment B, will be located within the **Premises** that constitutes evidence and instrumentalities of the crimes of possession of controlled substances with intent to

distribute, and attempts and conspiracies to do the same, in violation of Title 21, United States

Code, Sections 841(a)(1) and 846.

27.    Based on all the foregoing information, your affiant respectfully requests that the

Court issue a warrant to search the **Premises** located at 2233 Minnesota Avenue, S.E.

Washington DC for the items described in Attachment B, and to seize the items described in

Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

_____
Phillip Robinson, Detective
Metropolitan Police Department

Sworn to before me this _____day of October, 2015.

_____
Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE
 for the DISTRICT OF COLUMBIA